# EXHIBIT A



475 Riverside Drive, Suite 302
New York, NY 10115

(646) 745-8500

info@knightcolumbia.org

December 9, 2022

FOIA Officer
U. S. Department of State
Office of Information Programs and Services
A/GIS/IPS/RL
2201 C Street, N.W., Suite B266
Washington, D.C. 20520-0000
FOIARequest@state.gov

U. S. Department of State
Bureau of Cyberspace and Digital Policy
2201 C Street, N.W.
Washington, D.C. 20520-0000

U. S. Department of State
Bureau of Global Public Affairs
Office of Global Social Media
2201 C Street, N.W.
Washington, D.C. 20520-0000

U. S. Department of State
Bureau of Global Public Affairs
Office of Global Campaigns Strategy
2201 C Street, N.W.
Washington, D.C. 20520-0000

U. S. Department of State
Global Engagement Center
2201 C Street, N.W.
Washington, D.C. 20520-0000

U. S. Department of State
Bureau of Democracy, Human Rights, and Labor
2201 C Street, N.W.
Washington, D.C. 20520-0000

    **Re:   Freedom of Information Act Request**
            **Expedited Processing Requested**

To whom it may concern,

The Knight First Amendment Institute at Columbia University ("Knight Institute" or "Institute")[1] submits this request under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, to the U.S. Department of State for records related to foreign state influence over the development and enforcement of online platforms' content moderation policies.

The Institute seeks these records to provide the public with greater understanding of whether and how the Department of State advises and supports online platforms as they respond to attempts by foreign states to influence the development and enforcement of their content moderation policies, or to suppress the speech of their users.

## I. Background

Over the last several years, American social media companies have come under increasing pressure from foreign state actors around the world to suppress lawful speech and prioritize state-endorsed narratives on their services.[2] For example, in India—a country with nearly 1.4 billion people—the government has repeatedly pressured the platforms to suppress speech with which it disagrees, in one instance raiding Twitter's offices in response to supposed misinformation tweeted by the government's political opponents.[3] In 2020, then–President of the Phillipines Rodrigo Duterte publicly lashed out at Facebook for removing a network of fake accounts the company had linked to the military and police, stating, "We allow you to operate here hoping you could help us . . . what would be the point of allowing you to continue if you can't help us?"[4] The following year, Brazilian President Jair Bolsonaro issued rules prohibiting social media platforms from removing certain content, including his own false claims that he could lose the 2022 election only

---

[1] The Knight First Amendment Institute is a New York not-for-profit corporation based at Columbia University that works to preserve and expand the freedoms of speech and the press through strategic litigation, research, and public education.

[2] Hannah Bloch-Wehba, *Global Platform Governance: Private Power in the Shadow of the State*, 72 SMU L. Rev. 27 (2019) https://perma.cc/7AZ5-CX7C.

[3] Lauren Frayer & Shannon Bond, *India And Tech Companies Clash Over Censorship, Privacy And 'Digital Colonialism'*, Nat'l Pub. Radio (June 10, 2021), https://perma.cc/5RXG-N4G8.

[4] *Phillipines' Duterte calls out Facebook after accounts taken down*, Reuters (Sept. 28, 2020), https://perma.cc/CN3L-2ZTV.

2

if the vote were rigged.[5] Leaders who will not tolerate dissent, such as the military government in Myanmar, have shown themselves willing to impose strict social media controls when websites continue to host speech the government disfavors.[6]

These state efforts to pressure the platforms to suppress lawful speech—or to publish state-endorsed narratives—raise significant human rights concerns. Governments have an obligation—under Article 19 of the Universal Declaration of Human Rights, among other legal instruments—to respect freedom of expression.[7] And yet a number of governments have attempted to coerce tech companies into censoring disfavored speech or publishing government propaganda. This practice threatens to distort public discourse to anti-democratic ends, stifle the free flow of independent news and information to the public, and insulate political leaders from public criticism and dissent in the international community.[8]

Notably, most of the world's most popular online platforms are based in the United States.[9] This means that U.S.-based companies play a critical role in governing online expression internationally. While the Biden administration has identified the promotion of internet freedom as a top priority of its foreign policy, there is little public information regarding whether and how the U.S. Department of State has advised or supported the platforms in resisting foreign state pressure to facilitate online repression.[10] Accordingly, this request seeks U.S. Department of State records related to foreign state efforts to influence the development and enforcement of online platforms' content moderation policies. We are filing this request in an effort to help the public better understand whether and how the U.S. State Department advises online platforms regarding requests from foreign state actors to suppress user speech and prioritize state-endorsed speech.

---

[5] Jack Nicas, *Brazil's President Bans Social Networks From Removing Some Posts*, N.Y. Times (Sept. 9, 2021), https://perma.cc/Q6ZE-RGHQ.

[6] Amy Sood, *Elon Musk's free speech Twitter mission enters orbit of Asia's cyber laws, from India to Singapore*, South China Morning Post (Nov. 5, 2022), https://perma.cc/XYV8-KJYZ.

[7] Access Now et al., The Santa Clara Principles, https://perma.cc/975B-9PYN.

[8] The Office of the High Commissioner for Human Rights, *Moderating online content: fighting harm or silencing dissent?*, United Nations (July 23, 2021), https://perma.cc/XMS2-DK5V.

[9] Datareportal, Global Social Media Statistics, https://perma.cc/FM4T-UY2A (last visited Nov. 15, 2022).

[10] Adrian Shahbaz et al., *Countering an Authoritarian Overhaul of the Internet*, Freedom House (2022), https://perma.cc/4L8M-85QL.

## II.  Records Requested

The Knight Institute seeks the release of the following records, created on or after January 1, 2015:

1. Correspondence between any online platform[11] and the U.S. Department of State regarding:

   a. the development or modification of the online platform's jurisdiction-specific content moderation policies;

   b. any request made by a foreign state actor to the online platform to suppress content[12] on its services;

   c. any request made by a foreign state actor to republish, amplify, or prioritize content on its services; or

   d. any specialized or exclusive process or mechanism through which a foreign state actor can flag, or request that the online platform remove or demote, specific user content or accounts.

2. Correspondence between the U.S. Department of State and any foreign state actor regarding:

   a. the development or modification of the online platform's jurisdiction-specific content moderation policies;

   b. any request made by a foreign state actor to the online platform to suppress content on its services;

   c. any request made by a foreign state actor to republish, amplify, or prioritize content on its services; or

---

[11] For purposes of this request, an "online platform" refers specifically to social media platforms where content is broadcast to, or capable of being broadcast to, the general public or a significant section of the general public, including but not limited to Facebook, Instagram, Twitter, TikTok, and YouTube; digital distribution platforms where users can download applications, including but not limited to the App Store, Chrome Web Store, and Google Play; and cross-platform messaging applications, including but not limited to WhatsApp, Signal, and WeChat.

[12] For purposes of this request, "content" refers to all user-generated content, paid or unpaid, on a service, including advertising.

4

      d. any specialized or exclusive process or mechanism through which a foreign state actor can flag, or request that the online platform remove or demote, specific user content or accounts.

3. All records relating to how the U.S. Department of State addresses communications from online platforms regarding foreign state efforts to influence their content moderation policies or enforcement actions, including but not limited to all manuals, memoranda, policies, procedures, practices, instructions, training materials, e-mails, handouts, and Powerpoint presentations that explain or provide guidance to U.S. Department of State personnel or online platform personnel.

4. All records relating to foreign statutes or regulations that have been discussed, proposed, passed, or enacted by a foreign government intended to influence online platforms' rules regarding expression of political dissent.

5. All records related to any action taken by a foreign state or its representatives to pressure an online platform to suppress lawful speech or to publish or promote speech favorable to the foreign government, including the use of any extralegal measures targeting the online platform.

6. All records indicating the number of cases in which the U.S. Department of State directed, or otherwise provided guidance to, an online platform regarding the platform's compliance with any request by a foreign state actor to suppress speech on the platform's services, including but not limited to periodic datasets, logs, and/or reports.

We ask that you include all cover letters and attachments to these documents. We also ask that you disclose all segregable portions of otherwise exempt records. *See* 5 U.S.C. § 552(b). We ask that you provide responsive electronic records in their native file format. *See* 5 U.S.C. § 552(a)(3)(B). If that is not possible, please provide the records electronically in a text-searchable, static-image format (e.g., PDF), in the best image quality in the agency's possession, and in separate, Bates-stamped files. Finally, we ask that you direct this request to all appropriate offices and bureaus within the U.S. Department of State, including but not limited to the sub-components addressed in this request.[13]

---

[13] Please ensure that the search for responsive records includes offices and bureaus within the U.S. Department of State that have been dismantled or merged with other offices and bureaus (e.g., the Bureau of International Information Programs).

### III. Application for Expedited Processing

The Knight Institute requests expedited processing pursuant to 5 U.S.C. § 552(a)(6)(E). There is a "compelling need" for the documents sought because the information they contain is "urgent[ly]" needed by an organization primarily engaged in disseminating information "to inform the public concerning actual or alleged Federal Government activity." 5 U.S.C. § 552(a)(6)(E)(v)(II).

*A. The Knight Institute is primarily engaged in disseminating information in order to inform the public about actual or alleged government activity.*

The Knight Institute is "primarily engaged in disseminating information" within the meaning of FOIA. 5 U.S.C. § 552(a)(6)(E)(v)(II).

The Knight First Amendment Institute was established at Columbia University to defend and strengthen the freedoms of speech and the press in the digital age. Research and public education are essential to the Institute's mission.[14] Obtaining information about government activity, analyzing that information, and publishing and disseminating it to the press and public are among the core activities the Institute performs. *See ACLU v. DOJ*, 321 F. Supp. 2d 24, 29 n.5 (D.D.C. 2004) (finding a non-profit public interest group that "gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw material into a distinct work, and distributes that work to an audience" to be "primarily engaged in disseminating information") (quoting *Elec. Privacy Info. Ctr. v. Dep't of Def.*, 241 F. Supp. 2d 5, 11 (D.D.C. 2003)).[15]

For example, the Institute disseminates information about government activity—including information about government activity obtained through FOIA—through a variety of means, including its

---

[14] Mike McPhate, *Columbia University to Open a First Amendment Institute*, N.Y. Times (May 17, 2016), https://perma.cc/YC9M-LUAD; James Rosen, *New Institute Aspires to Protect First Amendment in Digital Era*, McClatchy DC (May 20, 2016, 4:43 PM), https://perma.cc/ZS2K-FPED.

[15] *See About the Knight Institute*, Knight First Amendment Inst., https://perma.cc/8UYT-RUUZ (explaining that a priority of the Knight Institute's work is "ensuring access to information necessary for self-government").

6

website,[16] Twitter account,[17] press releases,[18] blog posts,[19] op-eds,[20] and regular engagement with the press.[21] The Institute also publishes records obtained through FOIA in "Reading Rooms" on the Institute's website, which allows the public to search, filter, and view the records.[22]

Through its research program, the Institute has published multiple influential essay series, including: one focused on emerging threats to the system of free expression, one focused on reimagining the First Amendment in the digital age, one addressing the technology giants' power to shape public discourse, and one exploring lies and the law.[23] In addition, the Institute has convened five research symposia—drawing practitioners, lawyers, academics, and journalists—to debate, discuss, and reflect on key issues in First Amendment doctrine and free

---

[16] *See* Knight First Amendment Inst., https://knightcolumbia.org.

[17] *See* Knight First Amendment Inst. (@knightcolumbia), Twitter, https://perma.cc/HJG9-HEH9 (Knight Institute account with over 11,000 followers).

[18] *Knight Institute Calls on DOJ's Executive Office for Immigration Review to Suspend Policy Silencing Immigration Judges*, Knight First Amendment Inst. (Jan. 6, 2020), https://perma.cc/GT69-A8SC (describing an agency policy obtained through FOIA).

[19] *See, e.g.*, Carrie DeCell & Harsha Panduranga, *Social Media Vetting of Visa Applicants Violates the First Amendment*, Just Security (Dec. 6, 2019), https://perma.cc/XNZ9-RNT6; Ramya Krishnan & Trevor Timm, *Report Reveals New Details about DOJ's Seizing of AP Phone Records*, Colum. Journalism Rev. (May 23, 2019), https://perma.cc/6AUS-53YY.

[20] *See, e.g.*, Alex Abdo, *Facebook Is Shaping Public Discourse. We Need to Understand How*, Guardian (Sept. 15, 2018, 6:00 AM), https://perma.cc/6LUM-QC32; Jameel Jaffer & Ramya Krishnan, *We May Never See John Bolton's Book*, N.Y. Times (Jan. 30, 2020), https://perma.cc/HGY9-638T.

[21] *See* Cora Currier, *Government Can Spy on Journalists in the U.S. Using Invasive Foreign Intelligence Process*, Intercept (Sept. 17, 2018, 11:43 AM), https://perma.cc/YQ7F-NZ5R (reporting on DOJ rules obtained by the Knight Institute under FOIA); Ellen Nakashima, *U.S. Spy Agencies Sued for Records on Whether They Warned Khashoggi of Impending Threat of Harm*, Wash. Post (Nov. 20, 2018, 8:57 PM), https://perma.cc/NT7Q-9MML (describing FOIA lawsuits); Charlie Savage, *Trump Administration Sued Over Social Media Screening for Visa Applicants*, N.Y. Times (Dec. 5, 2019), https://perma.cc/ZMB2-6LSH (describing this APA and First Amendment lawsuit); Charlie Savage, *U.S. Government Went Through These People's Phones at the Border. Read Their Stories.*, N.Y. Times (Dec. 22, 2017), https://perma.cc/H7P2-RK2T (describing and publishing several hundred complaints obtained by the Knight Institute about warrantless searches of electronic devices at the border).

[22] *See, e.g.*, *Ideological Screening at the Border*, Knight First Amendment Inst., https://perma.cc/GCQ3-B79R.

[23] *See Research*, Knight First Amendment Inst., https://perma.cc/4DLY-MZD4.

speech theory. The first, "A First Amendment for All? Free Expression in an Age of Inequality," was held in March 2018;[24] the second, "The Tech Giants, Monopoly Power, and Public Discourse," was held in November 2019;[25] the third, "Data and Democracy," was held in October 2020;[26] the fourth, "Can We Conceive of a New Internet," was held in June 2021,[27] and the fifth, "Lies, Free Speech, and the Law" was held in April 2022.[28] In addition, the Institute regularly holds and co-sponsors public events in support of its mission to defend freedom of speech and the press in the digital age.[29]

### B. The records sought are urgently needed to inform the public about actual or alleged government activity.

The documents sought are urgently needed to inform the public about actual or alleged government activity. *See* 5 U.S.C. § 552(a)(6)(E)(v)(II). Specifically, the requested records are necessary for the public to understand efforts by foreign governments to distort public discourse on major public communications platforms.

This government interference with information sharing and organizing can occur without any public awareness. It also has major repercussions: social media platforms are central to global news consumption and political activity. As of 2022, an estimated 4.5 billion people use social media globally.[30] Adults frequently use social media to obtain news[31] and organize politically.[32]

---

[24] *A First Amendment for All? Free Expression in an Age of Inequality*, Knight First Amendment Inst., https://perma.cc/QKY4-ZVP7.

[25] *The Tech Giants, Monopoly Power, and Public Discourse*, Knight First Amendment Inst., https://perma.cc/26B5-5Q4C.

[26] *Data and Democracy*, Knight First Amendment Inst., https://perma.cc/XV9H-DDVQ.

[27] A. Adam Glenn, *Can We Conceive of a New Internet?*, Knight First Amendment Inst. (June 23, 2021), https://perma.cc/S946-942G.

[28] *Lies, Free Speech, and the Law*, Knight First Amendment Inst., https://perma.cc/H5HA-EHRM.

[29] *See Events*, Knight First Amendment Inst., https://perma.cc/LQ77-UC3B.

[30] Number of social media users worldwide from 2018 to 2027 (in billions), Statista, https://perma.cc/PUB2-UW5X (last visited Nov. 14, 2022).

[31] Elisa Shearer & Elizabeth Grieco, *Americans Are Wary of the Role Social Media Sites Play in Delivering the News*, Pew Research Center (Oct. 2, 2019), https://perma.cc/XT44-TPEK; Share of adults who use social media as a source of news in selected countries worldwide as of February 2022, Statista, https://perma.cc/F5AE-3NEP (last visited Nov. 14, 2022).

[32] *E.g.* Philip N. Howard et al., *Social Media, Civic Engagement, and the Slacktivism Hypothesis: Lessons from Mexico's "El Bronco"*, 70 Journal of Int'l

State Department records relating to foreign state efforts to distort these essential channels of information are urgently needed to illuminate whether and how the U.S. government is supporting U.S.-based platforms in defending free speech online.

For these reasons, the Knight Institute is entitled to expedited processing.

### IV. Application for Waiver or Limitation of Fees

The Knight Institute requests a waiver of document search, review, and duplication fees on the grounds that disclosure of the requested record is in the public interest and that disclosure is "likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester." 5 U.S.C. § 552(a)(4)(A)(iii).

For the reasons explained above, disclosure of the records sought would be in the public interest. Moreover, disclosure would not further the Knight Institute's commercial interest. The Institute will make any information disclosed available to the public at no cost. Thus, a fee waiver would fulfill Congress's legislative intent in amending FOIA to ensure "that it be 'liberally construed in favor of waivers for noncommercial requesters.'" *See Judicial Watch, Inc. v. Rossotti*, 326 F.3d 1309, 1312 (D.C. Cir. 2003) (quoting *McClellan Ecological Seepage Situation v. Calucci*, 835 F.2d 1282, 1284 (9th Cir. 1987)).

The Knight Institute also requests a waiver of search and review fees on the grounds that it qualifies as an "educational . . . institution" whose purposes include "scholarly . . . research" and the records are not sought for commercial use. 5 U.S.C. § 552(a)(4)(A)(ii)(II). The Institute has a substantial educational mission. Situated within a prominent academic research university, the Institute performs scholarly research on the application of the First Amendment in the digital era. The Institute's research program brings together academics and practitioners of different disciplines to study contemporary First Amendment issues and offer informed, non-partisan commentary and solutions. It publishes that commentary in many forms, including in scholarly publications and in short-form essays.

---

Affairs 55, (2016) https://perma.cc/JW8F-H4TK; Brooke Auxier & Colleen McClain, *Americans think social media can help build movements, but can also be a distraction*, Pew Research Center (Sept. 9, 2020), https://perma.cc/YQT8-Z8ZR; Eric Blanc, *Yes, Social Media can Help With Real-World Organizing*, The Forge (Dec. 8, 2021), https://perma.cc/DHR2-KJVD; Madeline Storck, The Role of Social Media in Political Mobilisation: a Case Study of the January 2011 Egyptian Uprising (Dec. 20, 2011) (M.A. dissertation, University of St. Andrews, Scotland) https://perma.cc/Y5PH-FPX4.

The Knight Institute also requests a waiver of search and review fees on the grounds that it is a "representative[] of the news media" within the meaning of FOIA and the records are not sought for commercial use. 5 U.S.C. § 552(a)(4)(A)(ii)(II).

The Institute meets the statutory definition of a "representative of the news media" because it is an "entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience." 5 U.S.C. § 552(a)(4)(A)(ii); *see also Nat'l Sec. Archive v. DOD*, 880 F.2d 1381, 1387 (D.C. Cir. 1989) (finding that an organization that gathers information, exercises editorial discretion in selecting and organizing documents, "devises indices and finding aids," and "distributes the resulting work to the public" is a "representative of the news media" for purposes of the FOIA); *accord Serv. Women's Action Network v. DOD*, 888 F. Supp. 2d 282 (D. Conn. 2012); *ACLU of Wash. v. DOJ*, No. C09-0642RSL, 2011 WL 887731, at *10 (W.D. Wash., Mar. 10, 2011); *ACLU*, 321 F. Supp. 2d at 30 n.5. Courts have found other non-profit organizations, whose mission of research and public education is similar to that of the Knight Institute, to be "representatives of the news media." *See, e.g., Cause of Action v. FTC*, 799 F.3d 1108 (D.C. Cir. 2015); *Elec. Privacy Info. Ctr.*, 241 F. Supp. 2d at 10–15 (finding that a non- profit group that disseminated an electronic newsletter and published books was a "representative of the news media" for purposes of the FOIA); *Nat'l Sec. Archive*, 880 F.2d at 1387; *Judicial Watch, Inc. v. DOJ*, 133 F. Supp. 2d 52, 53–54 (D.D.C. 2000) (finding Judicial Watch, self-described as a "public interest law firm," a news media requester).

For these reasons, the Knight Institute is entitled to a fee waiver.

\*   \*   \*

Thank you for your attention to our request. We would be happy to discuss its terms with you over the phone or via email to clarify any aspect of it.

/s/ Jennifer Jones
Jennifer Jones
Mayze Teitler
Knight First Amendment Institute
  at Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
jennifer.jones@knightcolumbia.org